| | | |
|---|---|---|
| Saul Maldonado, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:22-cv-02289-ALC |
| | ) | |
| National Football League, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO COMPEL ARBITRATION</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     THE RELEVANT PLAINTIFF TRANSACTIONS ..........................................2

III.    LEGAL STANDARD & MOVING PARTY'S BURDEN ................................3

IV.     PLAINTIFFS DID NOT AGREE TO ARBITRATE THEIR CLAIMS BECAUSE
        THEY WERE NOT ON NOTICE OF THE TERMS OF USE ..........................4

        A.      Plaintiffs were not on inquiry notice of the Terms of Use when they made
                purchases on a desktop computer. ...........................................................6

                1.      The Terms of Use links are "below the fold". ..............................6

                2.      The Terms of Use links are not presented in a clear and
                        conspicuous manner in light of the whole page. .........................8

        B.      Plaintiffs were not on inquiry notice of the Terms of Use when making a
                purchase on a mobile device. ................................................................10

                1.      When presented on a mobile device, the Terms of Use links are
                        both below the fold and obscured by the virtual keyboard. .....10

                2.      The Terms of Use links are even less conspicuous on a mobile
                        device than on a desktop. ..........................................................11

        C.      Plaintiffs were not on inquiry notice of the Terms of Use when they
                created an account on either website. ...................................................12

V.      EVEN IF CERTAIN PLAINTIFFS AGREED TO ARBITRATE CERTAIN
        CLAIMS, NOT ALL CLAIMS ARE SUBJECT TO ARBITRATION..........16

        A.      The scope of the Terms of Use is for the Court to determine. ............16

        B.      Plaintiffs are not bound to arbitrate claims for purchases made on other
                websites. ...............................................................................................19

                1.      Plaintiffs' claims for purchases on other websites are not
                        "connected with" the "Properties" or "Website".....................20

                2.      Each Terms of Use expressly states that it governs only the user's
                        use of that particular website. ..................................................22

                3.      The plain language of each Terms of Use acknowledges the
                        existence of other websites but does not include them in the
                        arbitration provision. ................................................................23

VI.     THE UNNAMED DEFENDANTS MAY NOT ENFORCE THE TERMS OF
        USE BECAUSE THEY ARE NOT AFFILIATES OF EITHER FANATICS OR
        NFL PROPERTIES ........................................................................................24

        A.      Neither the Fanatics.com Terms of Use nor the NFLShop.com Terms of
                Use show an intent to arbitrate with the unnamed Defendants. ...........25

B.    The NFL Defendants are not "affiliates" of Fanatics. ...........................................26

C.    The unnamed Defendants may not enforce the agreements under a theory of equitable estoppel. ...........................................................................................28

1.    Co-conspirators may not invoke estoppel to compel arbitration simply because they are co-conspirators. ...................................................30

2.    The unnamed Defendants do not have a corporate relationship to a signatory sufficient to invoke equitable estoppel. ....................................31

VII.    THERE IS NO ADMISSIBLE EVIDENCE OF THE ACTUAL FANATICS.COM TERMS OF USE THAT DEFENDANTS ALLEGE PLAINTIFFS AGREED TO ..................................................................................33

A.    The "Wayback Machine" evidence of Fanatics' 2017 Terms of Use is unauthenticated and inadmissible. ........................................................34

B.    Ms. Flinchbaugh's testimony violates the Best Evidence Rule. ...........................34

VIII.    CONCLUSION ..................................................................................................35

**Page**

## CASES

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010) ........................................................................................28, 31

*Amadeus Glob. Travel Distribution, S.A. v. Orbitz, LLC*,
    302 F. Supp. 2d 329 (D. Del. 2004) ....................................................................27

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017) ..................................................................7

*Bensadoun v. Jobe–Riat*,
    316 F.3d 171 (2d Cir. 2003) ..................................................................................4

*Berkson v. GoGo LLC*,
    97 F. Supp. 3d 359 (E.D.N.Y.) ...........................................................................10

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ........................................................................passim

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
    No. 17CV04570LAKKHP, 2017 WL 7309893 (S.D.N.Y. Nov. 20,
    2017), *report and recommendation adopted as modified*, No. 17-CV-4570
    (LAK), 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) ............................................7

*Blash v. BCS Placements, LLC*,
    No. 19-cv-6321, 2020 WL 2832777 (S.D.N.Y. May 31, 2020)...................17, 18

*Camilo v. Lyft, Inc.*,
    384 F. Supp. 3d 435 (S.D.N.Y. 2019) ..................................................................7

*Citibank, N.A. v. Franco*,
    No. 11 CIV. 2925 RMB, 2011 WL 6961404 (S.D.N.Y. Dec. 29, 2011) ..........27

*Compare Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002) ....................................................................................7

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    990 F.3d 173 (2d Cir. 2021) ........................................................................passim

*Cullinane v. Uber Techs., Inc.*,
    893 F.3d 53 (1st Cir. 2018) ..................................................................................15

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
    6 F.4th 308 (2d Cir. 2021) ............................................................................16, 19

*Doctor's Assocs., Inc. v. Alemayehu,*
    934 F.3d 245 (2d Cir. 2019) ........................................................16

*Doe v. Trump Corp.,*
    6 F.4th 400 (2d Cir. 2021) ....................................................29, 30

*Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.,*
    349 F. App'x 551 (2d Cir. 2009) .................................................35

*Feld v. Postmates, Inc.,*
    442 F. Supp. 3d 825 (S.D.N.Y. 2020) ..........................................4

*Foster v. Lee,*
    93 F. Supp. 3d 223 (S.D.N.Y. 2015) ...........................................34

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,*
    371 F. Supp. 2d 571 (S.D.N.Y. 2005) ..........................................32

*Granite Rock Co. v. Int'l Bhd. Of Teamsters,*
    561 U.S. 287 (2010) .....................................................................4

*In re Asian Yard Partners,*
    No. 95-333-PJW, 1995 WL 1781675 (Bankr. D. Del. Sept. 18, 1995)..........................27

*In re Titanium Dioxide Antitrust Litig.,*
    962 F. Supp. 2d 840 (D. Md. 2013)..............................................30

*In re Wholesale Grocery Prod. Antitrust Litig.,*
    707 F.3d 917 (8th Cir. 2013) ......................................................26

*Jones v. Halliburton Co.,*
    583 F.3d 228 (5th Cir. 2009) ......................................................22

*Kai Peng v. Uber Techs., Inc.,*
    237 F. Supp. 3d 36 (E.D.N.Y. 2017) .............................................7

*Laumann v. National Hockey League,*
    Nos. 12 Civ. 1817 & 3704(SAS), 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) ...............30

*McKee v. Audible, Inc.,*
    No. CV 17-1941-GW(EX), 2017 WL 4685039 (C.D. Cal. July 17, 2017)......................11

*Medicis Pharm. Corp. v. Anacor Pharms., Inc.,*
    No. CV 8095-VCP, 2013 WL 4509652 (Del. Ch. Aug. 12, 2013) ..................18

*Metter v. Uber Technologies, Inc.*,
No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) .........................7, 11

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ...........................................................................5, 7

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
770 F.3d 1010 (2d Cir. 2014) ...............................................................................16

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ..............................................................................16

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ..........................................................................passim

*Ostreicher v. TransUnion, LLC*,
No. 19-CV-8174, 2020 WL 3414633 (S.D.N.Y. June 22, 2020) ....................................18

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
817 A.2d 149 (Del. 2002) ...........................................................................20, 21

*Peiran Zheng v. Live Auctioneers LLC*,
2021 WL 2043562 (S.D.N.Y. May 21, 2021) ..............................................................5, 8

*Ramasamy v. Essar Glob. Ltd.*,
825 F. Supp. 2d 466 (S.D.N.Y. 2011) .......................................................................24

*Really Good Stuff, LLC v. BAP Invs., L.C.*,
No. 19-CIV-2218 (LLS)(GWG), 2021 WL 2469707 (S.D.N.Y. June 17, 2021).............34

*Roby v. Corp. of Lloyd's*,
996 F.2d 1353 (2d Cir. 1993) ...............................................................................21

*Ross v. Amer. Exp. Co.*,
574 F.3d 137 (2d Cir. 2008) ..............................................................29, 30, 31, 32

*Rui Chen v. Premier Financial Alliance, Inc.*,
No. 18-CV-3771 (YGR), 2019 WL 280944 (N.D. Cal. Jan. 22, 2019) ...........................35

*Ryan v. JPMorgan Chase & Co.*,
924 F. Supp. 2d 559 (S.D.N.Y. 2013) .........................................................................4

*Sarhank Group v. Oracle Corp.*,
404 F.3d 657 (2d Cir. 2005) ...............................................................................25

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ................................................................4

*Sellers v. JustAnswer LLC*,
    73 Cal.App.5th 444 (2021) ..............................................................16

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ..........................................................7

*Shah v. Wilco Sys., Inc.*,
    916 N.Y.S.2d 82 (2011) ..................................................................27

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008) ..................................................28, 30, 32

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,
    999 F.3d 828 (2d Cir. 2021) ..............................................................5

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019) ..............................................................6

*Temple v. Best Rate Holdings LLC*,
    360 F. Supp. 3d 1289 (M.D. Fla. 2018) ........................................8, 18

*The Republic of Iraq v. BNP Paribas USA*,
    472 F. App'x 11 (2d Cir. 2012) ......................................................24

*Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*,
    507 F. Supp. 3d 547 (S.D.N.Y. 2020). ..........................................35

*Wells Fargo Advisors, LLC v. Sappington*,
    884 F.3d 392 (2d Cir. 2018) ..........................................................18

**STATUTES**

11 U.S.C. § 101(2) .......................................................................................27

12 U.S.C. § 1841(k) .....................................................................................27

17 C.F.R. § 230.405 .....................................................................................27

17 C.F.R. § 240.12b–2 .................................................................................27

49 U.S.C. § 30106(d)(1) ..............................................................................27

8 Del. C. § 203(c)(1)...................................................................................................26

8 Del. C. § 203(c)(4)...................................................................................................27

9 U.S.C. § 1 .................................................................................................................31

**RULES**

SEC Rule 12b-2............................................................................................................27

SEC Rule 405 ..............................................................................................................27

**REGULATIONS**

N.Y. Banking Law § 6–l(1)(a) ....................................................................................27

# I.    INTRODUCTION

Plaintiffs, on behalf of a putative class of direct purchaser consumers, allege that Defendants Fanatics, Inc; the National Football League ("NFL"); NFL Properties; NFL Enterprises; and each of the 32 NFL Teams conspired to eliminate their smaller competitors and consolidate monopoly power in Fanatics, so that all Defendants could share in the resulting monopoly profits.

Likely preferring the secrecy and limited discovery available in arbitration, Defendants contend that the named Plaintiffs agreed to mandatory arbitration provisions included in the "Terms of Use" of either www.Fanatics.com (Plaintiffs Dunn, Maldonado, Marckmann) or www.NFLShop.com (Plaintiff Santos) or both (Plaintiff Hibbs). On the basis of those two Terms of Use, Defendants ask the Court to compel all Plaintiffs to arbitrate all of their claims against all Defendants. The motion must be denied, either in full or at least in part, for four primary reasons.

<u>First</u>, Plaintiffs did not agree to either website's Terms of Use because no Plaintiff had actual notice of the terms and none of the hyperlinks used to present the terms were reasonably conspicuous. As Harry Brignull, a Ph.D. cognitive scientist and expert in the use of "dark patterns" to direct (or misdirect) consumers' attention, explains, the Terms of Use hyperlinks on both websites are below the visible screen, obscured by the virtual keyboard (on mobile devices), and presented in the smallest, lowest contrast text on the page. To find inquiry notice, the Second Circuit requires that the relevant text be evaluated in the context of the full page. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016). When so considered here, Defendants' Terms of Use hyperlinks fail that test. *See* Part IV.

<u>Second</u>, even if Plaintiffs were on inquiry notice—which they were not—the arbitration provisions' scope does not include claims based on purchases made on other websites. That is, the Fanatics.com Terms of Use only apply to purchases made on Fanatics.com, and the NFLShop.com

Terms of Use only apply to purchases made on NFLShop.com. Neither applies to the other, or to third-party sites like Amazon.com. This is an issue for the Court to decide because neither Terms of Use contains "clear and unmistakable" language to the contrary. *See* Part V.

Third, separately from the issue of scope, the Court must also find that those Defendants who are not expressly named in the Terms of Use may not enforce the arbitration provisions in which they are not named. Neither website's Terms of Use shows an objective intention to give those Defendants the right to enforce the Terms, and none of the unnamed Defendants are "affiliates" of the entities that are named. Defendants' alternative request to compel arbitration under the principles of equitable estoppel should be rejected under controlling Second Circuit precedent. *See* Part VI.

Fourth, as an independent basis for denying Defendants' motion, Defendants have not submitted evidence of the actual Fanatics.com Terms of Use that they seek to enforce. Under Second Circuit law, Defendants' unauthenticated screen shots from an internet archive service and the testimony of Fanatics' employee as to those terms are inadmissible. Without evidence of the actual terms, Defendants have no basis to compel Plaintiffs to arbitrate. *See* Part VII.

## II.     THE RELEVANT PLAINTIFF TRANSACTIONS

As the bases for their Motion to Compel Arbitration, Defendants assert that Plaintiffs agreed to mandatory arbitration provisions in conjunction with the following transactions:

| Name | Date | Action | Website | Platform |
|------|------|--------|---------|----------|
| Lesia Dunn | 5/9/2021 | Purchase | Fanatics.com | Mobile |
| Lesia Dunn | 6/25/2020 | Purchase | Fanatics.com | Desktop |
| Lesia Dunn | 11/19/2018 | Account Creation | Fanatics.com | |

| Louis Hibbs[1] | 6/5/2021 | Purchase | NFLShop.com | Mobile |
|---|---|---|---|---|
| Louis Hibbs | 1/4/2020 | Purchase | NFLShop.com | Desktop |
| Louis Hibbs | 12/30/2019 | Account Creation | Fanatics.com | |
| Saul Maldonado[2] | 8/17/2019 | Account Creation | Fanatics.com | |
| Kimberly Marckmann[3] | 6/28/2017 | Account Creation | Fanatics.com | |
| Dean Santos[4] | 12/8/2021 | Purchase | NFLShop.com | Mobile |
| Dean Santos | 3/2/2021 | Account Creation | NFLShop.com | |

As confirmed in Fanatics' transactional data, each Plaintiff also made additional purchases that Defendants do not assert in their Motion as a basis to compel arbitration.[5]

## III.  LEGAL STANDARD & MOVING PARTY'S BURDEN

"The threshold question facing any court considering a motion to compel arbitration is []

---

[1] Mr. Hibbs also made at least one purchase from Defendants through Amazon.com, where Defendants' "Terms of Use" link was not presented. Ex. C, Hibbs Decl. ¶3.

[2] Defendants originally alleged that Mr. Maldonado assented to the NFLShop.com Terms of Use on two other occasions, both on October 16, 2021: (1) a purchase on NFLShop.com; and (2) by creating an account on NFLShop.com. Defs.' Ex. A, Flinchbaugh Decl. ¶11. Fanatics' transactional data, however, reveals that Mr. Maldonado did not make either transaction as Defendants had alleged in their Motion. Defendants now agree that those transactions are not a basis to compel arbitration. Ex. G, August 15, 2022 Letter from Fanatics to Plaintiffs at 4–5.

[3] Defendants originally alleged that Ms. Marckmann assented to the Fanatics.com Terms of Use by making a purchase on February 18, 2021. Defs.' Ex. A, Flinchbaugh Decl. ¶11. Fanatics' transactional data, however, reveals that Ms. Marckmann did not make the purchase as Defendants alleged. Defendants now agree that they do not assert that purchase as a basis to compel arbitration. Ex. G, August 15, 2022 Letter from Fanatics to Plaintiffs at 4–5.

[4] Defendants originally alleged that Mr. Santos assented to the NFLShop.com Terms of Use by making a purchase on October 6, 2021. Defs.' Ex. A, Flinchbaugh Decl. ¶11. They have since withdrawn that purchase as a basis to compel arbitration. Ex. G, August 15, 2022 Letter from Fanatics to Plaintiffs at 4–5.

[5] *See generally* Ex. H, Excerpts from Fanatics' Transactional Data.

whether the parties have indeed agreed to arbitrate." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) ("Inasmuch as the arbitrator has no authority of any kind with respect to a matter at issue absent an agreement to arbitrate, the question of whether such an agreement exists . . . is necessarily for the court and not the arbitrator.").

"The party seeking to compel arbitration bears the burden of establishing the existence of an arbitration agreement." *Feld v. Postmates, Inc*., 442 F. Supp. 3d 825, 829 (S.D.N.Y. 2020). In resolving "motions to compel [arbitration], courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia*, 834 F.3d at 229 (quoting *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). The often invoked "federal policy favoring arbitration" does not apply when courts are determining whether an arbitration agreement exists in the first instance. *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 302 (2010) (emphasizing that the policy does not "override[] the principle that a court may submit to arbitration only those disputes . . . that the parties have agreed to submit").

A court must "'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' and draw[] all reasonable inferences in favor of the non-moving party." *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179–80 (2d Cir. 2021) (quoting *Nicosia*, 834 F.3d at 229). The court should not compel arbitration unless "there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *Ryan v. JPMorgan Chase & Co*., 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013).

## IV.    PLAINTIFFS DID NOT AGREE TO ARBITRATE THEIR CLAIMS BECAUSE THEY WERE NOT ON NOTICE OF THE TERMS OF USE

Plaintiffs are not bound to arbitrate their claims because they did not assent to Defendants' Terms of Use. To establish that a valid agreement to arbitrate exists, Defendants bear the burden

of demonstrating by a preponderance of the evidence that Plaintiffs either received actual notice of the terms of the contract, or that they were on inquiry notice of the terms. *See Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 834–35 (2d Cir. 2021). Plaintiffs did not receive actual notice,[6] and Defendants do not argue that they did. Nor were Plaintiffs on inquiry notice.

To establish an enforceable contract under an inquiry notice theory, Defendants must establish by a preponderance of the evidence that "a 'reasonably prudent' person would be on inquiry notice of those terms *and* [the user] unambiguously manifested assent to those terms." *Id.* at 834 (quoting *Meyer*, 868 F.3d at 74–75) (emphasis added). Whether a plaintiff received inquiry notice is a "fact-intensive inquiry." *Soliman*, 999 F.3d at 835. A "person is on inquiry notice of [arbitration] terms if [the terms] are presented in a *clear and conspicuous* manner." *Id.* (emphasis added). To assess conspicuousness, the court must evaluate whether a reasonably prudent internet user would have seen the Terms of Use in light of the whole webpage. *Peiran Zheng v. Live Auctioneers LLC*, 2021 WL 2043562, at *4 (S.D.N.Y. May 21, 2021); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022). Courts look at the font size, color, contrast, and emphasis of the disclosure (both in isolation and in relation to other text on a page), and other images, text, hyperlinks, buttons, fields, and advertisements on the page. *Nicosia*, 834 F.3d at 237.

The Second Circuit has recognized specific features of a webpage's design and content that hinder a consumer's ability to receive inquiry notice of terms contained in a hyperlink, including:

- when the message alerting users of the terms and conditions is "not bold, capitalized, or conspicuous in light of the whole webpage";

- when the message on the webpage is obscured by various other links in differing colors, fonts, and locations;

---

[6] *See* Exs. B–F, Dunn Decl. ¶4; Hibbs Decl. ¶4; Maldonado Decl. ¶4; Marckmann Decl. ¶4; Santos Decl. ¶4.

- when other "buttons and promotional advertisements on the order page dr[a]w attention away from the message"; and

- when the "customers' personal address, credit card information, shipping options, and purchase summary" is on the webpage.

*Starke v. SquareTrade, Inc.*, 913 F.3d 279, 290–91 (2d Cir. 2019) (citations omitted) (quoting *Nicosia*, 834 F.3d at 237). Defendants contend that Plaintiffs are bound to arbitrate because they were on inquiry notice of the Terms of Use when they made purchases on desktop and mobile devices, and when they created accounts. As described below, however, a reasonably prudent person would not have been on inquiry notice for any of these purchases or account creations.

**A.     Plaintiffs were not on inquiry notice of the Terms of Use when they made purchases on a desktop computer.**

Defendants move to compel arbitration based on two purchases made on desktop computers, one each on Fanatics.com (Dunn, 6/25/20) and NFLShop.com (Hibbs, 1/4/2020). Neither Plaintiff received inquiry notice while making these purchases.

**1.     The Terms of Use links are "below the fold".**

When a user makes a purchase using a credit card on either Fanatics.com or NFLshop.com from a representative desktop computer,[7] the Terms of Use link is below the visible screen, requiring the user to scroll past the button used complete the order process. Ex. A, Declaration of Harry Brignull at 22–24 ("Brignull Decl."). Thus, neither Plaintiff had to see the disclosure to complete their purchase.

A court "cannot presume that a person who clicks on a box that appears on a . . . screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466 (S.D.N.Y.

---

[7] Although the Parties use "desktop" computer to distinguish computers from mobile phone devices, both a laptop and traditional desktop computer are considered "desktop" computers.

2017) (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016)). Therefore, requiring a plaintiff to scroll to see a disclosure of the Terms of Use is insufficient to put the user on inquiry notice. *Compare Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23, 31 (2d Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen") *and Metter v. Uber Technologies, Inc.*, No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only visible if user scrolled down, an action not necessary to complete the sign up process) *with Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (finding terms enforceable where "[t]he entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service").

Defendants do not cite a single case that found users assented to terms of use where the disclosure was "below the fold" and did not require a separate physical manifestation of assent (*i.e.*, a click box next to the terms).[8] Instead, the cases Defendants cite involved disclosures that were more conspicuous and required a much greater manifestation of agreement. *See e.g.*, *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 437–38 (S.D.N.Y. 2019) (J. Carter) (finding valid arbitration agreement where user had to push "I accept" button on screen and user was provided "opportunity to scroll through the entire updated terms . . . before accepting the terms."); *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 43 (E.D.N.Y. 2017) ("In order to use the Uber App to receive

---

[8] "Below the fold" is a term of art in the industry that refers to text or content that appears beneath the bottom of the visible screen as displayed to user and that therefore requires the user to scroll down to see it. *Bernardino v. Barnes & Noble Booksellers, Inc.*, cited by Defendants, discusses the possibility of the disclosure being below the fold on a mobile device, but concluded that plaintiff's testimony that it was her "usual practice" to shop online in portrait mode was insufficient where the disclosure was above the fold in portrait mode. No. 17CV04570LAKKHP, 2017 WL 7309893, at *8 (S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted as modified*, No. 17-CV-4570 (LAK), 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018). Here, the disclosure is below the fold on desktop and mobile, in any orientation.

transportation requests, Uber drivers had to click on a "YES, I AGREE" box twice to indicate assent to Uber's Services Agreement."). And one of Defendants' cases found a disclosure conspicuous specifically because it was above, not below, the action button. *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1304 (M.D. Fla. 2018).

> **2.** **The Terms of Use links are not presented in a clear and conspicuous manner in light of the whole page.**

Even if a user scrolls down the page, the Terms of Use links are not presented in a conspicuous manner when evaluated in light of the full page. *See Nicosia*, 834 F.3d at 237; *Peiran Zheng*, 2021 WL 2043562, at *4; *Berman*, 30 F.4th at 856–57. Instead, the Terms of Use link on each website is presented in an obscure manner such that a user's attention is drawn to everything but the Terms of Use. *See generally* Brignull Decl. at 27–30. Beginning in the top left corner of each page and running the entire width of the website is a countdown clock in large text on a yellow background offering "Free Shipping." *Id.* at 34. This "pressure selling technique" and others (e.g., "PRICE LOCKED IN For A Limited Time Only!") encourage the user to move quickly through the checkout process. *Id.* The large, bright, and bold text and background also naturally draw a user's attention while they "scan read" the page. *See id.* at 9-12.[9]

Below the "Free Shipping" countdown clock, a user's attention is drawn to the text they would need to verify to receive their purchase: the shipping address and payment information. At 15 pixels in size, the "Shipping Address" text is almost 50% larger and has almost 2.5x the contrast of the Terms of Use link, which is just 10.8 pixels. *Id.* at 29 (Table 3). The purchaser's address information is 14 pixels in size—over 30% larger than the Terms of Use link—and is also presented with a much higher contrast than the Terms of Use link. *Id.* The "Edit" hyperlink just

---

[9] "Scan reading" is the name researchers use to describe the fact that users "tend to look at the big, prominent things first and smaller things later." *See* Brignull Decl. at 9.

underneath the address information, is presented in 13-pixel blue, capitalized text that is almost 20% larger than the Terms of Use link. *Id.* The "payment radio buttons," which require the user to choose their form of payment, are 14 pixels in size, and—like almost everything on the page—are shown in much higher contrast than is the Terms of Use link. *Id.* Below that set of text, the user would verify the charges and input their credit card information (in similarly large font) in the large fields above the red "Place Order" button. All this text is larger than the 10.8 pixel "Terms of Use" link, making it the smallest on the page, and almost all of the other text appears at a much higher contrast. *Id.* at 29 (Table 3). There are also numerous colors on the Website—a yellow box, a red place order button, an NFL logo (on the NFL site), and logos for various credit cards, PayPal, and "Click to Pay." *Id.*, App'x. 1 at 28. The user's attention is further drawn to a green box on the right-hand side of the page for a shipping offer and a field to input coupons.

The order process described above is similar to the process in *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016). In *Nicosia*, despite the phrase "by placing your order, you agree to Amazon.com's privacy notice and conditions of use" being visible *without scrolling*, the court found that the message was not "bold, capitalized, or conspicuous in light of the whole webpage." *Id.* at 237. The court found it compelling that the screen on which the terms of use link was presented contained "text . . . in at least four font sizes and six colors," along with several buttons and advertisements. *Id.* at 237. But the websites here are even worse in that they contain at least <u>six</u> font sizes and at least six different colors. Moreover, as in *Nicosia*, here "the presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has." *Id.*

Considered in context here, the Terms of Use link that Defendants argue is conspicuous is, in fact, the smallest, lowest contrast text on the entire page. *Cf. Berkson v. GoGo LLC*, 97 F. Supp.

3d 359, 403–04 (E.D.N.Y. 2015) (denying motion to compel where terms of use link, like here, was not in all caps, large font, or bolded, and not denoted with "important" or "please read"). When Fanatics requires information necessary to the sale, or desires selling something else (like upselling a Fanatics credit card—*see* "Learn More"!) to the user, it presents that information in text that is significantly larger and higher contrast (that is, more prominent) than the Terms of Use link. *Id.* at 30, n.21. Given the Terms of Use link's relative inconspicuousness, it does not put a reasonable user on inquiry notice. Accordingly, Defendants' motion to compel must be denied to the extent it is based on desktop purchases.

**B.** **Plaintiffs were not on inquiry notice of the Terms of Use when making a purchase on a mobile device.**

Defendants also move to compel arbitration based on two purchases made on mobile devices, both on NFLShop.com (Hibbs, 6/5/2021; Santos, 12/8/21). As with the desktop purchases, Plaintiffs did not receive inquiry notice while making these purchases.

**1.** **When presented on a mobile device, the Terms of Use links are both below the fold and obscured by the virtual keyboard.**

First, like on desktop, the Terms of Use link is below the viewable screen on a mobile device. Unlike a desktop computer, however, a mobile user's view of the link is further blocked by the popup virtual keyboard that appears when typing:[10]

---

[10] Brignull Decl at 21–24; Appx. 1 at 24. The effect is the same when the device is in "landscape" mode. Brignull Appx. 1 at 26.



Obscuring the terms below the fold and with the keyboard deprives a reasonably prudent user of inquiry notice. *See McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *10 (C.D. Cal. July 17, 2017) (finding terms of use unenforceable, in part, because popup keyboard on mobile app potentially obscured users' view of disclosure); *Metter*, 2017 WL 1374579, at *3 (noting "the keypad obstruction turns Uber's terms of service alert into something resembling an unenforceable 'browsewrap agreement' because a registrant can purportedly agree to Uber's terms of service without knowing he is doing so").[11]

### 2. The Terms of Use links are even less conspicuous on a mobile device than on a desktop.

Even if Plaintiffs had seen the Terms of Use below the fold and behind the keyboard popup, the Terms are inconspicuous given the general layout of the page on the mobile device. Like the

---

[11] Even for those users for who scrolled down enough to see the Terms of Use link with the virtual keyboard hidden, it would only have been visible for a fleeting moment after the user is finished typing in the required information and just before he clicks the large, red "Create an Account" or "Complete Order" button—at the time when the user reasonably feels that he has completed the required actions and is <u>least</u> focused on the page.

display on the Desktop, the order confirmation page directs a user's attention everywhere but the Terms of Use disclosure.

At the top of the page there is again an advertisement in large bold text with a countdown window in a yellow box. Brignull Decl., Appx. 1 at 24. Although the relevant pages are similar on a desktop and mobile device, much of text on a mobile device is presented in even larger font—with the exception of the Terms of Use link, which remains a paltry 10.8 pixels. *Id.* at 29 (Table 3). The consumer's address information, payment radio buttons, and "shipping dropdown" menu on a mobile device (each now at 16 pixels) are almost 50% larger than the Terms of Use link. *Id.* The "Shipping Address" on a mobile screen is even larger at 18 pixels—almost twice the size (and 2.5X the contrast) of the Terms of Use link. *Id.*

Below all of that, a mobile user still needs to verify their shipping information and select and input their credit card information. *Id.*, Appx. 1 at 15. They would then encounter a bright red box with large white words saying, "Complete Order." Only after that are users confronted with the disclosure, again in the smallest, lowest contrast text on the page. *Id.* at 26.

Given the links' even greater relative inconspicuousness on a mobile page, it does not put a reasonable user on inquiry notice. Accordingly, Defendants' motion to compel must be denied to the extent it is based on completing an order on mobile devices.

C. **Plaintiffs were not on inquiry notice of the Terms of Use when they created an account on either website.**

Defendants also move to compel arbitration based on Plaintiffs' account creations on Fanatics.com (Marckmann, 6/28/21; Dunn, 11/19/18; Maldonado, 8/17/19; and Hibbs, 12/30/19) and NFLShop.com (Santos, 3/2/21). Although Defendants do not specify the device used for any

of the account creations, it is a reasonable inference that all were created using mobile devices.[12]

According to Defendants, the Account Creation page for both sites looked like this:[13]



But during the account creation process on a mobile device—that is, when the user is entering their information needed to create an account—the Terms of Use link is completely obscured by the virtual keyboard:[14]

---

[12] Plaintiffs Hibbs and Santos made mobile purchases on the same day they created their accounts. All of Maldonado's purchase transactions were mobile, as were all but one of Plaintiffs Dunn and Marckmann's purchases. *See* Ex. H, Excerpts of Fanatics Transaction Data. It is thus reasonable to infer all Plaintiffs used a mobile device to create their accounts.

[13] Defs.' Ex. A, Flinchbaugh Decl. ¶23.

[14] Brignull Decl. at 21–24; Appx. 1 at 2. The Terms of Use link cannot be seen in landscape mode regardless of whether the virtual keyboard is on or off. Brignull Decl., Appx. 1 at 3–4.



And even when physically shown on a screen, Defendants designed the Terms of Use link to be smaller than the surrounding text, with low contrast, and, importantly, gray, instead of the typical blue used to denote a hyperlink. Although a recent update to the account creation page makes it now impossible to determine the exact color contrast of the Terms of Use link shown during the relevant period, Plaintiffs' expert opines based on Fanatics' screenshot that it was likely the lowest contrast text on the page. Brignull Decl. at 30–31. Fanatics' choice to make Terms of Use some of the smallest text with the lowest contrast—and to make that small, low-contrast text gray instead of blue—is the opposite of conspicuous, making it far less likely for a user to click the link and see the agreement to arbitrate. *See id.*

Courts have found agreements to arbitrate unenforceable where the disclosure was as conspicuous, if not more conspicuous, as Defendants' Terms of Use link here. *See e.g.*, *Berman*, 30 F.4th at 853-54 (finding unenforceable an agreement to arbitrate that included the text "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" in small, gray text above a large green "continue" button); *Applebaum*, 263 F. Supp. 3d at

466–67 (finding unenforceable an agreement to arbitrate that used a clickbox next to "I agree to Lyft's Terms of Service" on a page with only a field to input a user's phone number because even the blue coloring there was insufficient "to indicate the existence of a hyperlink to a contract").

In *Berman*, the Ninth Circuit considered text presented in a strikingly similar manner to the Terms of Use link in question here. The court found the link in question inconspicuous because—just like the Terms of Use links here—it presented in tiny font that, although underlined, was neither blue nor in all capitals. *Berman*, 30 F.4th at 857 (noting that "[c]ustomary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters"). The court held that "the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* at 857.

After filing their motion, Fanatics changed the font color of the Terms of Use and Privacy Policy hyperlinks from light gray to blue. Brignull Decl. at 31. This change implicitly acknowledges what *Berman* and other courts have stated outright—that users struggle to recognize hyperlinks that are not called out with blue text. *Accord Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) (finding plaintiffs were not on inquiry notice of Uber's "Terms of Service" despite it being "displayed in a larger font, in bold, contrasting in color, and highlighted by the box around it" because, in part, "Uber's 'Terms of Service & Privacy Policy' hyperlink did not have the common appearance of a hyperlink" (i.e., blue text)).

"Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Specht*, 306 F.3d at 35. "Because 'online providers have complete control over the design of their websites,' 'the onus must be on website owners to put users on

notice of the terms to which they wish to bind consumers.'" *Berman*, 30 F.4th at 857 (first quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 465 (2021); and then quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014)). To the extent that Defendants rely on Plaintiffs' account creations, their motion should be denied.

## V.     EVEN IF CERTAIN PLAINTIFFS AGREED TO ARBITRATE CERTAIN CLAIMS, NOT ALL CLAIMS ARE SUBJECT TO ARBITRATION

Even if Plaintiffs were on inquiry notice of the Terms of Use as to certain Defendants— which they are not—Plaintiffs are not bound to arbitrate all their claims against all Defendants. Both questions—that is, the scope of the arbitration provisions and who may enforce them—are issues that must be decided by the Court. This Part V addresses the first question and explains why the Fanatics.com Terms of Use cover only claims made for purchases on Fanatics.com (and the NFLShop.com Terms of Use cover only purchases made on NFLShop.com).

### A.     The scope of the Terms of Use is for the Court to determine.

The default presumption is that questions about whether an arbitration agreement applies to a particular suit "should be resolved by the court and not referred to the arbitrator.'" *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (quoting *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250–51 (2d Cir. 2019)). To overcome this default presumption, the party seeking to compel arbitration of arbitrability bears the burden of establishing a "clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014). The Court decides the issue here because the terms do not call for "all" disputes to be sent to arbitration.

Neither the Fanatics.com Terms of Use nor the NFLShop.com Terms of Use expressly say who shall decide the question of arbitrability. In the absence of such language, the other provisions of the agreement are determinative in discerning the parties' intent. *DDK Hotels*, 6 F.4th at 318.

Because those provisions do not "clearly" or "unmistakably" call for an arbitrator to decide, the issue remains with the Court.

First, contrary to Defendants' argument, the arbitration provisions in each of the websites' Terms of Use do <u>not</u> call for "any and all disputes" related to the agreement to be submitted to arbitration. Instead, the Terms of Use more specifically require that "any and all disputes, claims and causes of action (collectively, 'Claims') <u>arising out of or connected with the Properties</u> (except for small claims court cases, if applicable)" be resolved by binding arbitration:[15]

> As a condition of using the Properties, you and we agree that any and all disputes, claims and causes of action (collectively, "Claims") arising out of or connected with the Properties (except for small claims court Claims, if applicable) shall be resolved exclusively by binding arbitration under the rules of the American Arbitration Association ("AAA"), including the Supplementary Procedures for Consumer-Related Disputes, for full and final settlement of such Claim applying the Federal Arbitration Act and other federal arbitration laws. YOU UNDERSTAND AND AGREE THAT YOU ARE WAIVING YOUR

The NFLShop.com Terms of Use is identical with the sole exception that it uses the term "Web Site". Defs.' Ex. A-7, NFLShop.com TOU ¶15. The terms "Properties" and "Web Site" in each case are defined as the web, mobile, and app versions of the respective website on which the Terms of Use are found; that is, "Properties" used in the Fanatics.com Terms of Use means www.fanatics.com, and "Web Site" as used in the NFLShop.com Terms of Use means www.nflshop.com.

Because the Terms of Use call for disputes connected to the <u>websites</u> to be arbitrated, Defendants' cases are distinguishable. In *Blash v. BCS Placements, LLC*, for example, the relevant language called for the arbitration of all disputes "arising out of, or relating to, <u>this letter agreement</u> or the performance thereof." No. 19-cv-6321, 2020 WL 2832777, at *4 (S.D.N.Y. May 31, 2020)

---

[15] Defs.' Ex. A-5, Fanatics.com TOU at ¶22 (highlights added). Defendants omitted this language from the "arbitrability" section of their brief. *See* Defs.' Mem. at 21. The choice to omit it only underscores its importance.

(emphasis added). Because a dispute as to the arbitrability of a claim was itself a dispute relating to the meaning of the letter agreement, the *Blash* agreement's terms clearly and unmistakably slated the dispute for an arbitrator. But the agreements at issue here call for the arbitration only of disputes arising out of or connected with the websites—not the agreements themselves.

Likewise, in *Wells Fargo Advisors, LLC v. Sappington*, the relevant language required that "any controversy arising out of <u>this Agreement</u>" be arbitrated. 884 F.3d 392, 394 (2d Cir. 2018) (emphasis added). In fact, the *Wells Fargo* agreement was even more express than in *Blash* in that it also explicitly required that "[a]ny controversy relating to your duty to arbitrate hereunder" be arbitrated. *Id.* Neither Terms of Use here contains any such language. With respect to whether an agreement "clearly and unmistakably" refers disputes about arbitrability to an arbitrator, the difference between an agreement that arbitrates all disputes arising under the agreement itself (*Blash*, *Wells Fargo*) and an agreement that arbitrates only disputes arising out of the service provided is meaningful. *Cf. Ostreicher v. TransUnion, LLC*, No. 19-CV-8174, 2020 WL 3414633, at *9 (S.D.N.Y. June 22, 2020) (contrasting "a more limited provision regarding disputes 'arising out of or relating to th[e] Account,'" with cases involving more broad language implicating any disputes between the parties without any limitation").[16]

Second, reference to AAA rules is not dispositive here because incorporation of AAA rules only constitutes clear and unmistakable intent to delegate arbitrability when the agreement

---

[16] The Terms of Use also further narrow the set of disputes subject to mandatory arbitration by exempting small claims court disputes, injunctions regarding intellectual property, and claims for "temporary or emergency equitable relief." *See, e.g.*, Defs.' Ex. A-5, Fanatics.com TOU ¶22. While those exclusions are not implicated here, they further distinguish the Terms of Use from other agreements that require arbitration of "all" disputes, period. *See Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1301 (M.D. Fla. 2018); *Medicis Pharm. Corp. v. Anacor Pharms., Inc.*, No. CV 8095-VCP, 2013 WL 4509652, at *3 (Del. Ch. Aug. 12, 2013) (finding that agreement did not provide for arbitration of "all" disputes where it allowed for judicial proceedings to enforce the parties' rights under the agreement and exempted patent-related disputes).

elsewhere expresses the intent to arbitrate "all aspects of all disputes." *See DDK Hotels*, 6 F.4th at 318–19. But where the agreement is "narrower, vague, or contains exclusionary language" limiting the set of to-be-arbitrated disputes to something less than "all," the incorporation of AAA rules, "does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *Id.* at 319.

In the absence of true "all dispute" language, the incorporation of AAA rules does not control and there is no other language that even arguably demonstrates an intent that an arbitrator decides preliminary disputes about arbitrability. In the absence of such language, questions about whether an arbitration agreement applies to a particular suit "should be resolved by the court and not referred to the arbitrator.'" *Id.* at 317.

**B.      Plaintiffs are not bound to arbitrate claims for purchases made on other websites.**

There is no dispute that certain Plaintiffs have made purchases relevant to their claims on websites other than the transactions that Defendants claim bind these Plaintiffs to Defendants' Terms of Use.[17] Those terms, however, only mandate arbitration for claims and disputes "arising under or connected with" the particular website associated with each Terms of Use. This means that the NFLShop.com Terms of Use does not extend to require arbitration of claims based on Fanatics.com purchases and vice versa (*i.e.*, Fanatics.com Terms of Use does not require mandatory arbitration of NFLShop.com purchases). Thus, for example, Fanatics cannot compel Plaintiff Maldonado to arbitrate his claims for purchases made on NFLShop.com simply because it claims he consented to the Terms of Use on Fanatics.com. And neither the Fanatics.com Terms

---

[17] Plaintiff Maldonado, for example, made purchases on both sites, but Defendants only assert in their Motion that he agreed to the Fanatics.com Terms of Use (allegedly when he created a Fanatics.com account). Ex. H-3, Excerpt of Maldonado Transaction Data. And Plaintiff Hibbs, for example, purchased from Fanatics on Amazon.com. Ex. C, Hibbs Decl. ¶3.

of Use nor the NFLShop.com Terms of Use extend to require arbitration of Plaintiff Hibbs' purchases on Amazon.com.

### 1. Plaintiffs' claims for purchases on other websites are not "connected with" the "Properties" or "Website".

The Terms of Use require arbitration only for claims or disputes "arising out of or connected with" the websites. The determinative question, then, is whether Plaintiffs' claims based on non-Property/Web Site purchases either "arise out of" or are "connected with" the particular website underlying each Terms of Use (www.Fanatics.com for the Fanatics.com Terms of Use and www.NFLShop.com for the NFLShop.com Terms of Use). They do not.

A dispute over a purchase made on Fanatics.com does not arise out of the NFLShop.com website, and a dispute over a purchase made on NFLShop.com does not arise out of the Fanatics.com website. The same can be said for disputes based on purchases made on Amazon.com or any other website that is not the particular website implicated in the Fanatics.com or NFLShop.com Terms of Use as the "Properties" or "Web Site" respectively.

Nor are claims based on purchases made on other websites "connected with" the individual Property or Web Site that is the subject of each Terms of Use. To be "connected with" a particular something, a claim must not be "independently and separately assertable" in the absence of the thing to which connection is required (here, the Properties or Web Site). *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 157 (Del. 2002) (holding that language mandating arbitration for claims "in connection with" a contract requires analyzing whether the claims could have been asserted in the absence of the contract); *see also id.* ("We hold that they would be independently and separately assertable in that situation and are therefore not 'in connection with' the Agreement.").

Under *Parfi*, a claim's similarity in facts is not enough to establish a "connection" with the object to be connected to (here the Property or Web Site). *Id.* (noting that finding a connection based on claims arising from "some or all of the same facts" would "give[] far too expansive a meaning to the word 'connection'"). Defendants argue that the arbitration clauses encompass claims for purchases made on third-party websites because the clauses are "broad" and because Plaintiffs have alleged "one overarching conspiracy." Defs.' Mem. at 8, n.7. But as noted above, the clauses are not nearly as broad as Defendants portray them, and their contention that such claims are connected because they all implicate shared facts and allegations of "one overarching" conspiracy does not meet the *Parfi* test.

Accordingly, Plaintiffs' claims for purchases made on NFLShop.com are not "connected with" Fanatics.com and claims for purchases made on Fanatics.com are not "connected with" NFLShop.com, because in each case the claims would be independently and separately assertable in the absence of the other website. The same is true for Plaintiff Hibbs' claim based on his purchases made on Amazon.com.

The result is the same under federal cases as well. In *Cooper v. Ruane Cunniff & Goldfarb Inc.*, the Second Circuit reached a similar conclusion when considering the phrase "relate to" used in an arbitration clause in an employment agreement. 990 F.3d 173, 183 (2d Cir. 2021).[18] There, the court held that the plaintiff's ERISA claims did not "relate" to his employment because the claims did not depend on any facts unique to his employment and because other employees could have brought identical claims. *Id.* at 183–84. The Second Circuit cited with approval the Fifth

---

[18] In the context of arbitration clauses, the phrases "in connection with" and "related to" have substantially the same meaning. *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993) (stating that "[w]e find no substantive difference in the present context between the phrases 'relating to,' 'in connection with' or 'arising from'").

Circuit's reasoning in a similar case that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, the phrase would not have much limiting power because 'really, universally, relations stop nowhere.'" *Cooper*, 990 F.3d at 183 (quoting *Jones v. Halliburton Co.*, 583 F.3d 228, 238–39 (5th Cir. 2009)) (noting the Eleventh Circuit also recognizes "related to" as marking a boundary "otherwise, the term would stretch to the horizon and beyond").

Although *Cooper* arose in an employment context, its reasoning applies well here. To the extent that Plaintiffs' claims stem from purchases made on NFLShop.com, for example, those claims do not depend on any facts unique to their use of Fanatics.com. And the same antitrust claims for NFLShop.com or Amazon.com purchases could be brought by other consumers; just as other employees could have brought the same claims in *Cooper*.

<blockquote>

### 2. Each Terms of Use expressly states that it governs only the user's use of that particular website.

</blockquote>

The Terms of Use consistently limit the arbitration clauses to claims directly connected to its underlying website through multiple expressions elsewhere in the Terms of Use. Repeatedly, the Terms of Use make clear that they govern and apply to Plaintiffs' use of that particular website—not to Plaintiffs' use of any other website. Each document contains a dispute resolution notice, at the very top of the document and in all capital letters, stating that the dispute resolution clause applies to claims relating to "your use of the online store": [19]

> NOTICE REGARDING DISPUTE RESOLUTION. THESE TERMS CONTAIN TERMS THAT GOVERN HOW CLAIMS BETWEEN YOU AND US RELATING TO YOUR USE OF THE ONLINE STORE WILL BE RESOLVED FOR EXAMPLE, SECTION 22 CONTAINS AN ARBITRATION AGREEMENT AND WAIVER OF CLASS ACTION WHICH STATES THAT WE MUST ARBITRATE INSTEAD OF GOING TO A COURT BEFORE A JUDGE AND JURY AND THAT ALL SUCH ARBITRATION CLAIMS MUST BE BROUGHT IN YOUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS REPRESENTATIVE OR MEMBER OR OTHERWISE ON BEHALF OF OTHERS IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING.

---

[19] Defs.' Ex. A-5, Fanatics.com TOU at 1; Defs.' Ex. A-7, NFLShop.com TOU at 1 (same). Ms. Flinchbaugh omits the highlighted portions from her declaration when quoting each TOU. *See* Defs.' Ex. A, Flinchbaugh Decl. ¶¶28, 33. Again, the omission underscores its importance.

Each makes clear throughout that it governs the consumer's "use" of the <u>website</u> (whether Fanactics.com or NFLShop.com). Defs.' Ex. A-7, NFLShop.com TOU ¶1 ("YOUR USE OF THE WEBSITE . . . IS AT ALL TIMES SUBJECT TO THESE TERMS AND CONDITIONS . . . ."); Defs.' Ex. A-5, Fanatics.com TOU at 1 ("Your use of the Properties . . . is at all times subject to these Terms of Use . . . ."). And each expressly states that it applies to "your access to and use of this website, www.fanatics.com," and "your access to and use of this web site, www.nflshop.com." *Id.*; Defs.' Ex. A-7, NFLShop.com TOU at 1.

### 3. The plain language of each Terms of Use acknowledges the existence of other websites but does not include them in the arbitration provision.

Elsewhere in each Terms of Use, Fanatics recognizes the existence of other websites, including other websites that Fanatics owns or operates, and defines those other websites collectively as "Other Platforms." Defs.' Ex. A-5, Fanatics.com TOU ¶11; Defs.' Ex. A-7, NFLShop.com TOU ¶9 (using term "Third-Party Sites"). Thus, under the Fanatics.com Terms of Use, "Other Platforms" includes Amazon.com and NFLShop.com. Similarly, under the NFLShop.com Terms of Use, "Third-Party Sites" would include Amazon.com and Fanatics.com.

Despite creating a defined term for those other websites, each arbitration provision is limited to claims that arise out of or are connected with just its respective Property or Web Site— leaving out any mention or reference to Other Platforms. *Compare* Defs.' Ex. A-5, Fanatics.com TOU ¶14 (reserving the right to "terminate your access to the Website or Other Platforms.") *with id.* ¶22 (mandating arbitration for claims connected with "the Properties" only). In drafting the arbitration clause, Fanatics chose only to require arbitration for disputes connected to each individual website—and omitted from the arbitration clause other websites ("Other Platforms"), whether Fanatics-owned or not. Considering each document as a whole, that choice demonstrates

an intent that the arbitration provision does not apply to the "Other Platforms" (Fanatics.com Terms of Use) or "Third-Party Sites" (NFL Shop.com Terms of Use).

## VI. THE UNNAMED DEFENDANTS MAY NOT ENFORCE THE TERMS OF USE BECAUSE THEY ARE NOT AFFILIATES OF EITHER FANATICS OR NFL PROPERTIES

Regardless of the scope of the claims covered by the Terms of Use, they may only be enforced by the actual Defendants named in each respective document. That is, only Fanatics may enforce the Fanatics.com Terms of Use. And only Fanatics and NFL Properties may enforce the NFLShop.com Terms of Use. As with the scope of the terms, the question of who may enforce them "is a 'gateway matter' that is for the Court to determine." *Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 469 (S.D.N.Y. 2011); *see also The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11, 13 (2d Cir. 2012) ("Where, as here, the arbitration clause does not clearly vest any right to invoke arbitration in a non-party such as Iraq, *a fortiori,* it does not afford Iraq the right to have arbitrators rather than a court determine the arbitrability of its dispute.").

As Defendants must concede, the Terms of Use do not expressly name all Defendants in this Action. Instead, the Fanatics.com Terms of Use names only "Fanatics, Inc. and/or its affiliates," and the NFLShop.com Terms of Use names only "Fanatics Entities" and "NFL Properties LLC and/or its affiliated entities." Defs.' Ex. A-5, Fanatics.com TOU at 1; Defs' Ex. A-7, NFLShop.com TOU at 1. The unnamed Defendants contend that they may still enforce the terms for two reasons: (1) that the NFL Defendants are "affiliates" of Fanatics; and (2) in the alternative, that the NFL Defendants may invoke the principles of equitable estoppel to compel Plaintiffs to arbitrate with them. Neither argument holds up, as explained below.

**A.**   **Neither the Fanatics.com Terms of Use nor the NFLShop.com Terms of Use show an intent to arbitrate with the unnamed Defendants.**

There is nothing on the face of either Terms of Use indicating "an objective intention to agree to arbitrate" with the unnamed Defendants. *See Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005). Each Terms of Use's arbitration clause states only that "you and we" agree to arbitration. Defs' Ex. A-5, Fanatics TOU at ¶21; Defs' Ex. A-7, NFLShop.com TOU at ¶15. As addressed in greater detail below, the Fanatics.com Terms of Use defines "we" and "us" as Fanatics and its affiliates. *See* Defs' Ex. A-5, Fanatics TOU at 1. The NFLShop.com Terms of Use defines "we" and "us" as Fanatics, NFL Properties, and their respective affiliates. Defs' Ex. A-7, NFLShop.com TOU at 1. Neither contains any reference to another party's right to arbitration. *Id.*

The absence of the NFL, NFL Enterprises, and the NFL Teams from the Terms of Use is in stark contrast to the NFLShop.com Privacy Policy (presented to consumers next to the Terms of Use), which expressly names the NFL member teams and other NFL Defendants individually. Ex. I, NFLShop.com Privacy Policy at 1. A consumer who viewed both agreements would reasonably conclude that while the Privacy Policy included the named NFL entities, the Terms of Use did not include those same entities because they were not named.

Moreover, even though Defendant Fanatics maintains both of the websites and their Terms of Use, the very presence of NFL Properties in the NFLShop.com Terms of Use but not the Fanatics.com Terms of Use indicates an objective intent that NFL Properties (or any other NFL Defendant) does not have the right to compel arbitration under the Fanatics.com Terms of Use. And the presence of NFL Properties in the NFLShop.com Terms of Use, but not the NFL or NFL Teams, indicates an objective intent that those entities do not have the right to compel arbitration under that agreement. In short, there is nothing on the face of the agreements "that the contracts

explicitly anticipated a signatory would enter into the type of relationship with a non-signatory—here, the relationship being that of antitrust co-conspirators—that ultimately gave rise to the claims." *In re Wholesale Grocery Prod. Antitrust Litig.*, 707 F.3d 917, 923–24 (8th Cir. 2013).

### B. The NFL Defendants are not "affiliates" of Fanatics.

In order to show that the Fanatics.com Terms of Use expressly covers any of the NFL Defendants, or that the NFLShop.com Terms of Use covers any of the NFL Defendants other than NFL Properties, Defendants bear the burden to prove that those unnamed Defendants are "affiliates" of these named entities. Defendants cannot meet their burden for two reasons.

First, the NFLShop.com Terms of Use contradicts Defendants' position that Fanatics and the NFL are affiliates because it expressly distinguishes between Fanatics and "its subsidiaries or affiliates (the 'Fanatics Entities')" and NFL Properties LLC (the 'NFL')" and its affiliates. Defs' Ex. A-7, NFLShop.com TOU at 1.

Second, the alleged affiliate entities do not meet the common and widespread definition of "affiliate" in the law.[20] The Delaware General Corporation Law business combination statute, 8 Del. C. § 203(c)(1), defines "affiliate" as a person who "directly, or indirectly through 1 or more intermediaries, controls, or is controlled by, or is under common control with, another person."[21]

Courts have relied on this definition of "affiliate" when addressing a contract that incorporates Delaware law and the term is otherwise undefined in the contract. *See In re Asian*

---

[20] Neither Terms of Use provides a definition for "affiliate".

[21] Defendants contend that "Delaware law expressly governs the arbitration provisions, as set forth in the TOUs." Defs.' Mem. at 17. While the Fanatics.com Terms of Use states that both Delaware and federal law govern its terms, the NFLShop.com Terms of Use is silent on choice of law. Nevertheless, both Defendant entities expressly named in the NFLShop.com Terms of Use (Fanatics and Defendant NFL Properties) are Delaware corporations and it is therefore appropriate to consider both Delaware and federal law in evaluating whether other Defendants are their "affiliates" as used in the NFLShop.com terms.

*Yard Partners*, No. 95-333-PJW, 1995 WL 1781675, at *17-19 (Bankr. D. Del. Sept. 18, 1995); *see also Amadeus Glob. Travel Distribution, S.A. v. Orbitz, LLC*, 302 F. Supp. 2d 329, 335 (D. Del. 2004) (declining to follow *Asian Yard*'s definition where "the parties have provided an unambiguous definition of 'affiliate,' but holding that "control" was the relevant determining factor in whether parties were "affiliates"). Even beyond Delaware, courts, statutes, regulatory agencies, and others define "affiliate" based on control.[22]

"Control" is defined, in part, as "the possession, directly or indirectly, of the power to *direct or cause the direction of the management and policies of a person*, whether through the ownership of voting stock, by contract or otherwise." 8 Del. C. § 203(c)(4) (emphasis added). Both *Asian Yard* and *Amadeus* define control as having "the power to direct" management and policies. *Asian Yard*, 1995 WL 1781675, at *19; *Amadeus*, 302 F. Supp. 2d at 335–36.

Here, there is no such control. Defendants do not contend that Fanatics owns or controls any part of any NFL Defendant, and no evidence has been presented to show that any of the NFL Defendants has the power to direct either Fanatics or NFLP.[23] Defendants state that "Plaintiffs

---

[22] *See Citibank, N.A. v. Franco*, No. 11 CIV. 2925 RMB, 2011 WL 6961404, at *4 n. 2 (S.D.N.Y. Dec. 29, 2011); *Shah v. Wilco Sys., Inc.*, 916 N.Y.S.2d 82 (2011) ("[I]t was an appropriate exercise of discretion for the court to clarify the term 'affiliate' by referencing a statutory definition of that term."). These sources are replete with definitions of "affiliate" that encompass corporations who share a controller. *See, e.g.*, 49 U.S.C. § 30106(d)(1) ("The term "affiliate" means a person other than the owner that directly or indirectly controls, is controlled by, or is under common control with the owner."); 11 U.S.C. § 101(2) ("The term "affiliate" means . . . [a] corporation . . . directly or indirectly owned, [or] controlled . . . by the debtor, or by an entity that directly or indirectly owns [or] controls . . . the debtor . . . ."); 12 U.S.C. § 1841(k); SEC Rule 405, 17 C.F.R. § 230.405; SEC Rule 12b-2, 17 C.F.R. § 240.12b–2; N.Y. Banking Law § 6–l(1)(a).

[23] In their briefing, Defendants claim that "the NFL is part owner of Fanatics," Defs.' Mem. at 19, but do not identify which specific NFL entity is an owner in Fanatics and have objected to producing in discovery any evidence of what NFL entity is an owner and the extent of that owner's control. It is Defendants' burden to provide evidence sufficient to support their request for relief and, in the absence of that evidence, it cannot be a basis for finding that the non-named entities are affiliates of either Fanatics or NFLP.

allege an affiliate relationship," Defs.' Mem. at 17, but that is not true. Defendants point to language in the Complaint alleging, "[T]he NFL purchased a three percent stake in Fanatics for $95 million," but that small stake does not make the NFL Defendants affiliates of Fanatics. Defendants also point to Complaint language alleging NFLP was "created by the NFL and its member teams," but that also does not make the NFL Defendants affiliates of these entities. Indeed, the interrelatedness of these entities (and their lack of control over one another) has already been considered thoroughly by the Supreme Court, which concluded that the NFL, NFLP, and the NFL teams are not a singular economic enterprise for purposes of licensing of the team's intellectual property. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 188 (2010). Given the inability of any of the individual NFL Defendants to exclusively control the NFLP, none of them are its affiliate. *See id.* at 194.

### C. The unnamed Defendants may not enforce the agreements under a theory of equitable estoppel.

Controlling Second Circuit law prevents the unnamed Defendants[24] from enforcing the Terms of Use under a theory of equitable estoppel. As a preliminary point, it is not sufficient that the subject matter of the dispute arguably falls within the scope of the arbitration agreement. *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361–62 (2d Cir. 2008) ("While the arbitrability of the subject matter of the dispute was an essential condition to a finding of estoppel [in other cases], it was not sufficient to justify that conclusion."); *see also id.* ("Indeed, if the dispute had

---

[24] As noted above, different Defendants are parties to the Fanatics.com and NFLShop.com Terms of Use. With respect to the Fanatics.com Terms of Use, the unnamed defendants are all NFL Defendants. Because the NFLShop.com Terms of Use expressly names both Fanatics and Defendant NFLP, the NFL Team Defendants and NFL Enterprises are the specific non-signatory Defendants to that agreement.

not been related to the arbitration contract, even a dispute between the parties who contracted with one another to arbitrate [] would not have been arbitrable.").

Instead, the Second Circuit requires a two-part test be met before a defendant may successfully use a theory of equitable estoppel to enforce an arbitration agreement to which it was a not a party. <u>First</u>, the non-signatory must demonstrate that "the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Cooper*, 990 F.3d at 179. <u>Second</u>, the non-signatory must *also* demonstrate that the "relationship among the parties [is] of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Id.* (citing *Ross v. Amer. Exp. Co.*, 574 F.3d 137, 143–44 (2d Cir. 2008)). This latter element is often described to as seeking to determine whether the relationship between the parties is a "close" one. *Doe v. Trump Corp.*, 6 F.4th 400, 413–14 (2d Cir. 2021).

Defendants' argument that the Court need only look to Delaware law under the relevant choice of law provisions, and that therefore *Ross* and Second Circuit law on equitable estoppel does not control, *see* Motion at 20, n.12, is incorrect for two primary reasons. <u>First</u>, the NFLShop.com Terms of Use has no choice of law provision—period.[25] <u>Second</u>, the Fanatics.com Terms of Use calls for both Delaware <u>and</u> federal law. *See* Defs' Ex. A-5 ¶21 ("Governing Law. These Terms of Use . . . will be governed by <u>federal</u> and Delaware law . . . .") (emphasis added).

---

[25] The NFLShop.com Terms of Use contains a Delaware <u>forum selection</u> provision but does not specify what law governs the agreement. *See* Defs.' Ex. A-7, NFLShop.com TOU at ¶15.

The unnamed defendants do not have a close relationship to each agreement's respective signatory parties under controlling Second Circuit law because they do not have the corporate relationship to a signatory sufficient to invoke equitable estoppel.

### 1. Co-conspirators may not invoke estoppel to compel arbitration simply because they are co-conspirators.

It is well-established in the Second Circuit that allegations of concerted or conspiratorial conduct are not sufficient for a non-signatory to successfully invoke equitable estoppel to enforce an arbitration agreement. *See Ross*, 574 F.3d at 144–48 (reversing district court decision that applied equitable estoppel based "exclusively on allegations of collusion"); *Laumann v. National Hockey League*, Nos. 12 Civ. 1817 & 3704(SAS), 2013 WL 837640, at *2 n.25 (S.D.N.Y. Mar. 6, 2013) (noting that a "non-signatory to an arbitration agreement cannot enforce an arbitration clause where its only relationship to the signatories is as a co-conspirator"). In case after case—and most recently again in *Doe v. Trump Corp.*—the Second Circuit has reaffirmed that when "the nonsignatory is alleged to be a third-party wrongdoer as it is here, we have made clear that the arbitration contract 'in no way' extends to the non-signatory." 6 F.4th at 413–14 (quoting *Ross*, 547 F.3d at 145; *Sokol Holdings*, 542 F.3d at 362). It also cannot be enough that the same transactions form the basis of the claims against both the non-signatory and signatory defendants; if it were, the Second Circuit would not have rejected the application of equitable estoppel in the conspiracy cases noted above.

Even assuming *arguendo* that only Delaware law applied, Defendants' primary case acknowledges that the Delaware test is interpreted narrowly in the Second Circuit. *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 850–51 (D. Md. 2013) ("[T]he Second Circuit indeed gives a narrower reading to the equitable estoppel doctrine in the context of conspiracy claims . . . ."). Nor is there any actual conflict between Delaware and Second Circuit

law in actual application. The Delaware test asks whether the "allegations" are of "substantially interdependent" conduct, which is simply another way of articulating the Second Circuit's requirement that the "issues" be "intertwined." *Cooper*, 990 F.3d at 179. To the extent that any conflict must be resolved, this Court must follow Second Circuit precedent dictating that coconspirator status is not enough for a non-signatory to compel arbitration. That result makes sense considering Defendants seek to compel arbitration under federal law. *See* ECF No. 41, Mot. at 1 (citing 9 U.S.C. § 1 *et seq.*).

### 2. The unnamed Defendants do not have a corporate relationship to a signatory sufficient to invoke equitable estoppel.

None of the unnamed Defendants is a subsidiary, parent, or affiliate of a signatory defendant. *See supra*, Part VI.B. The absence of a formal corporate relationship of that sort is critical. *See Ross*, 547 F.3d at 144 ("[T]his Court's cases . . . share a common feature in that the non-signatory party asserting estoppel has had some sort of *corporate* relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities.") (listing cases) (emphasis added); *see also Am. Needle, Inc.*, 560 U.S. at 201 ("The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being.").

Nor is it sufficient that Plaintiffs allege that the NFL is an investor in Fanatics.[26] None of the NFL Defendants are affiliates of Fanatics. And there is no reason to believe that the NFL's status as an investor would be known to a purchaser at the time the Terms of Use were allegedly agreed to. *Cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 578

---

[26] Defendants have objected to producing evidence of their ownership or control of Fanatics. *See note* 23. But it is Defendants' burden to provide evidence sufficient to support their request for relief, and, in the absence of that evidence, it cannot be a basis for allowing the non-signatory NFL Defendants to compel arbitration.

(S.D.N.Y. 2005) (non-signatory to partnership agreement could avail itself of arbitration clause contained therein where plaintiffs alleged it owned 99% of signatory).[27]

Defendants understate *JLM Industries* in contending that it is sufficient for a non-signatory to merely be in a "vertical relationship" with the signatory. *See* Defs.' Mem. at 20, n.12. The relevant parties in *JLM* were not just in a "vertical" business relationship; they in fact had a parent-subsidiary relationship—the exact type of formal corporate relationship found dispositive in other cases applying estoppel but that is not present here. *Accord Ross*, 387 F.3d at 178 (citing *JLM* as one of many Second Circuit cases relying on a formal corporate relationship between signatory and non-signatory).

Fanatics' use of the unnamed Defendants' names and logos is clearly for shopping convenience and does not prove affiliate-ness. The presence of references to the NFL Defendants gives no reason for a consumer to believe that she is entering into a commercial relationship with those entities when purchasing a product or creating an account. The question is not whether a consumer had reason to know that she was entering into a contract with a party that itself had some relationship of any kind to another non-signatory, however tenuous. *See Sokol Holdings*, 542 F.3d at 359 ("*JLM Industries* did not say or mean that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate."). Rather, the question is whether there is some relationship <u>with the unnamed party itself</u> sufficient to show an

---

[27] Defendants' argument that "Plaintiffs themselves allege that Defendants 'operated as a single unified entity,'" Defs' Mem. at 19, misstates the Complaint, which simply alleges that "[e]ach Defendant," in the singular, operated as a single unified entity with "its subsidiaries, affiliates, and agents"—not that all Defendants acted as a singled unified entity together. The entire substance of the Complaint is that Defendants are individual and separate horizontal competitors in the marketplace.

intent to arbitrate with that entity, despite it not being a signatory. *See Ross.*, 547 F.3d at 146 ("[T]he further necessary circumstance of some relation between Amex and the plaintiffs sufficient to demonstrate that the plaintiffs intended to arbitrate this dispute with Amex is utterly lacking here.").

The NFL references to which Defendants point—which appear alongside the logos of every major professional sports league, the National Collegiate Athletic Association, and World Wrestling Entertainment, Inc., to name just a few—serve as a guide to the various products available for sale on the websites, not a list of every entity with which a consumer is entering into a relationship with simply by creating an account or purchasing a product. Similarly, the "drop down banner" that Defendants tout is nothing more than a shortcut to help consumers find the products they are looking for—not a list of corporate entities with whom they are agreeing to deal. There is no reason, for example, that a reasonable consumer would understand herself to be entering into a relationship with the Jacksonville Jaguars when purchasing a NY Giants t-shirt on fanatics.com. Nor is there any reason to believe that any reasonable consumer would have understood Fanatics' "About Us" page to include any NFL Defendant in the concept of "Us."

## VII. THERE IS NO ADMISSIBLE EVIDENCE OF THE ACTUAL FANATICS.COM TERMS OF USE THAT DEFENDANTS ALLEGE PLAINTIFFS AGREED TO

As a final matter, Defendants have not submitted admissible evidence of the Fanatics.com Terms of Use that they contend bind Plaintiffs to arbitrate. The August 11, 2021 Fanatics.com Terms of Use Defendants submit plainly states that "[y]our access to and use of the Properties will be governed by the Terms of Use <u>in effect at the time of such access or use</u>." Defs.' Ex. A-5, Fanatics.com TOU ¶ 1 (emphasis added). But there is no admissible evidence of the terms that were in effect at the time of the relevant Fanatics.com transactions, all of which occurred <u>before</u> August 11, 2021.

As a substitute, Defendants offer only (1) an unauthenticated document described as an archived copy of an older Fanatics.com Terms of Use obtained from the internet site "Wayback Machine,"[28] and (2) the self-serving testimony of an employee that the "substance of the arbitration provision" was the same pre-August 2021. *See* Defs.' Ex. A, Flinchbaugh Decl. ¶31. Both the purported copy of the Terms of Use and the testimony of its contents are inadmissible.

## A. The "Wayback Machine" evidence of Fanatics' 2017 Terms of Use is unauthenticated and inadmissible.

Unauthenticated printouts from the "Wayback Machine" are inadmissible in the absence of evidence that can properly authenticate the documents. *See Really Good Stuff, LLC v. BAP Invs., L.C.*, No. 19-CIV-2218 (LLS)(GWG), 2021 WL 2469707, at *10 (S.D.N.Y. June 17, 2021) ("While the Second Circuit has upheld the admission of Wayback Machine evidence, it did so only where an 'office manager' of the site explained how it worked and authenticated screenshots taken from the archive."). "[C]ourts have rejected evidence from the Wayback Machine when the only evidence submitted were screenshots attached to an attorney declaration." *Id.* at *10; *cf. Foster v. Lee*, 93 F. Supp. 3d 223, 231 (S.D.N.Y. 2015) (admitting Wayback Machine evidence when submitted with an affidavit from an employee of Internet Archive). Defendants provide no such evidence to properly authenticate these screenshots.

## B. Ms. Flinchbaugh's testimony violates the Best Evidence Rule.

Ms. Flinchbaugh's testimony is also inadmissible because it violates the best evidence rule. *See* Fed. R. Evid. 1002. For Ms. Flinchbaugh to testify to the terms in Fanatics' Terms of Use in effect at the time of the relevant transactions, Defendants would have to produce the actual document(s). *See Nicosia*, 384 F. Supp. at 268 (*citing Rui Chen v. Premier Financial Alliance,*

---

[28] The Internet Archive's "Wayback Machine" is an archival service for web pages. *See United States v. Gasperini*, 2017 WL 3140366, at *6 (2d Cir. July 21, 2017).

*Inc.*, No. 18-CV-3771 (YGR), 2019 WL 280944, at *1 n.3 (N.D. Cal. Jan. 22, 2019) (finding that best evidence rule precluded declaration of defendant's attorney describing online arbitration agreement)). Without the actual agreement, she cannot testify as to its contents. *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020).

"[A] party seeking to enforce a contract must prove not only the existence of the contract, but also its terms." *Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 555 (2d Cir. 2009) (citations omitted). Defendants have not proven the contents of the Fanatics.com Terms of Use they allege Plaintiffs agreed to, and therefore their motion to compel arbitration based on Fanatics.com transactions must be denied.

## VIII.   CONCLUSION

As a matter of law, Plaintiffs did not consent to Defendants' Terms of Use where the disclosure links were inconspicuous when considered in the context of the whole page. And even if they had, the arbitration clauses contained in those terms do not apply to all claims and, whatever their scope, cannot be enforced by all Defendants. For the foregoing reasons, this Court should deny Defendants' Motion to Compel Arbitration.

Dated: September 2, 2022                     Respectfully submitted,


                                             **BURNS CHAREST LLP**

                                             */s/ Spencer Cox*
                                             Spencer Cox (*admitted pro hac vice*)
                                             Christopher J. Cormier (*admitted pro hac vice*)
                                             4725 Wisconsin Avenue, NW, Suite 200
                                             Washington, DC 20016
                                             Tel: (202) 577-3977
                                             Fax: (469) 444-5002
                                             ccormier@burnscharest
                                             scox@burnscharest

and

Warren T. Burns
NY Bar No. 4312906
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

and

Patrick Murphree (*admitted pro hac vice*)
365 Canal Street, Suite 1170
New Orleans, LA 70130
Tel: (504) 799-2845
Fax: (504) 881-1765
pmurphree@burnscharest.com

and

**BARRACK, RODOS & BACINE**

William J. Ban
Michael A. Toomey
Eleven Times Square
640 8th Ave, 10th Floor
New York, NY 10036
Telephone: (212) 688-0782
Fax: (212) 688-0783
wban@barrack.com
mtoomey@barrack.com

and

Jeffrey B. Gittleman
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838
jgittleman@barrack.com

and

Stephen R. Basser

600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Fax: (619) 230-1874
sbasser@barrack.com

and

**GIRARD SHARP LLP**

Dena C. Sharp (*admitted pro hac vice*)
Adam E. Polk (*admitted pro hac vice*)
Kyle P. Quackenbush (*admitted pro hac vice*)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
kquackenbush@girardsharp.com

**BROWN, NERI, SMITH & KHAN, LLP**

Andrew M. Purdy
15615 Alton Parkway, Suite 450
Irvine, California 92618
Tel.: (949) 676-0031
Fax: (310) 593-9980
andrew@bnsklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing and any exhibits thereto was filed via the Court's CM/ECF system that will cause all counsel of record to receive electronic notice of this submission.

*/s/ Spencer Cox*
Spencer Cox
BURNS CHAREST LLP

*Attorney for Plaintiffs*