UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAUL MALDONADO, et al., *Plaintiffs*, -against- NATIONAL FOOTBALL LEAGUE, et al., *Defendants*. | 1:22-CV-02289 (ALC) <u>OPINION & ORDER</u> |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs filed the instant action against Defendants Fanatics, Inc.; the National Football League ("NFL"); NFL Properties ("NFLP"); NFL Enterprises; and each of the 32 NFL Teams (collectively, "Defendants"), alleging Sherman Act injuries arising from their various online purchases of NFL Licensed Merchandise from Defendants. Compl. ¶¶ 6, 7-12, ECF No. 5. Pending before the Court is Defendants' motion to compel arbitration. ECF No. 42.

After reviewing the parties' submissions and all other relevant materials, the Court **GRANTS** Defendant's motion, ECF No. 42.

## BACKGROUND

### I. Statement of Facts

The Court assumes the parties' familiarity with the facts and procedural background of this case. Defendants Fanatics and NFLP operate two online stores to sell NFL Licensed Products, Fanatics.com and NFLShop.com (collectively, "Defendants' Websites"). Plaintiffs allege they each "purchased NFL Licensed Products directly from Defendants during the Relevant Time Period." Compl. at ¶¶ 14-18, ECF No. 5. On March 22, 2022, Plaintiffs filed this putative nationwide class action, alleging violation of the Sherman Act and seeking injunctive relief under the Clayton Act. *Id.* at ¶¶ 322-41. Plaintiffs claim they paid overly high prices for these products due to Defendants' alleged conspiracy to "dominate the retail market for online

1

sales of NFL Licensed Products." *Id.* ¶¶ 6, 7-12. On May 27, 2022, Defendants filed a motion to compel arbitration (ECF No. 42). Defendants allege Plaintiffs assented to the Fanatics and NFLShop terms of use ("TOU") and its arbitration provision by creating an account or completing a purchase on Defendants' Websites, either via desktop computer or mobile device. Plaintiffs filed their opposition on September 2, 2022 (ECF No. 70), claiming they were not on notice of the TOU and thus not bound by the arbitration agreement. Defendants replied on October 5, 2022 (ECF No. 77).

Plaintiffs claim that even if Plaintiffs agreed to arbitrate, certain Defendants cannot enforce the agreement since they were neither named specifically in the agreement nor covered under more general language. Plaintiffs also claim that certain disputes are not covered by the agreement. Fundamentally, Plaintiffs contest the validity of their assent to the arbitration agreement and argue they were not on inquiry notice of such terms. Defendants argue notice of the agreement was reasonably conspicuous, and Plaintiffs assented to it. The Court finds that Plaintiffs agreed to arbitrate, all Defendants are covered by the agreement, and the issue of whether certain claims are covered by the agreement should be decided by the arbitrator.

For the reasons stated herein, Defendants' motion to compel arbitration is hereby **GRANTED**.

## LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), which governs arbitration agreements, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has held that the FAA established "a liberal federal policy favoring arbitration agreements" and that courts must "rigorously . . . enforce arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct.

1612, 1621 (2018) (citation omitted). Parties may agree to have an arbitrator decide both "'gateway' questions of 'arbitrability'" and the merits of their contractual disputes. *Rent-A-Ctr. West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). See also *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 527 (2019). Questions of arbitrability include: "(1) 'whether the parties are bound by a given arbitration clause' and (2) 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 45 (E.D.N.Y. 2017) (quoting *VRG Linhas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013)).

In deciding whether claims are subject to arbitration, the Court must determine (1) whether the parties entered into a valid agreement to arbitrate at all and (2) whether the claim falls within the scope of the agreement. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citing *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)). "Before addressing the second inquiry, we must also determine who—the court or the arbitrator—properly decides the issue." *In re Am. Exp.*, 672 F.3d at 128 (citing *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011). The Supreme Court has "distinguished between 'questions of arbitrability,' which are to be resolved by the courts unless the parties have clearly agreed otherwise, and other 'gateway matters,' which are presumptively reserved for the arbitrator's resolution." *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 351 F.3d 43, 45 (2d Cir. 2003), quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-85 (2002). "Questions of arbitrability" regards "dispute[s] about whether the parties are bound by a given arbitration clause" and "disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Howsam*, 537 U.S. at 84. Questions of arbitrability are subject to judicial

resolution *unless* "there is clear and unmistakable evidence from the arbitration agreement ... that the parties intended that [they] be decided by the arbitrator." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks omitted). But "where parties would likely expect that an arbitrator would decide the gateway matter", there is a presumption that "procedural questions which grow out of the dispute and bear on its final disposition" are for the arbitrator to decide. *Howsam*, 537 U.S. at 84 (internal quotation marks omitted). Waiver and estoppel are presumptively decided by the arbitrator. *Republic of Ecuador*, 638 F.3d at 394. "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011).

When determining whether the parties have entered a valid agreement to arbitrate, "courts should apply ordinary state-law principles that govern the formation of contracts," and evaluate the allegations "to determine whether they raise a genuine issue of material fact." *Sacchi v. Verizon Online LLC*, No. 14-CV-00423, 2015 WL 765940, at *4 (S.D.N.Y. Feb. 23, 2015) (internal citations and quotation marks omitted).

In deciding a motion compel, courts must first determine "whether the parties agreed to arbitrate." *Id.* Next, courts must decide "whether the issue of arbitrability is for the court or for the arbitrator." *Gringas v. Think Fin., Inc.*, 922 F.3d 112, 125 (2d Cir. 2019) (quoting *Bell*, 293 F.3d at 565. Courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Schein*, 139 S.Ct. at 531 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

In general, courts have found "clear and unmistakable evidence" of parties' intention to arbitrate arbitrability when there is "[b]road language expressing an intention to arbitrate all aspects of all disputes ...." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019). See also *Bolden v. DG TRC Mgmt. Co., LLC*, No. 19-CV-003425 (KMW), 2019 WL 2119622, at *4-7 (S.D.N.Y. May 15, 2019). Similarly, courts have concluded if "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005). See also *Southside Hosp. v. New York State Nurses Ass'n*, 732 F. App'x 53, 55 (2d Cir. 2018) (same); *Offshore Expl. & Prod., LLC v. Morgan Stanley Private Bank, N.A.,* 626 F. App'x 303, 305-06 (2d Cir. 2015) (same).

## DISCUSSION

### I. Plaintiffs Agreed to Arbitrate with the Defendants Explicitly Named in the Agreement.

"Clarity and conspicuousness of arbitration terms are important in securing informed assent." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (internal citations and quotations omitted). "[T]he conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a[n] [] agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Conspicuousness is a legal question for the Court. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 70-71, 77-79 (2d Cir. 2017) (examining screenshots of the Uber application to find conspicuousness); see *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 437-40 (S.D.N.Y. 2019) (analyzing screenshots to determine a motion to compel). To determine whether a plaintiff assented to the terms of a web-based contract, courts "look to the design and content of the relevant interface to determine if the contract terms were presented

5

to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2019). The Second Circuit has developed a framework to analyze "the validity of assent" and notice a web user has to a website's TOU and arbitration provision that can be accessed via hyperlink. *Peiran Zheng v. Live Auctioneers LLC*, No. 20-CV-09744 (JGK), 2021 WL 2043562, at *4 (S.D.N.Y. May 21, 2021) (citing *Starke*, 913 F.3d at 292). "Whether a web user had 'reasonable notice' of contract terms contained in a contract accessible by hyperlink depends on the "totality of the circumstances." *Id*. at *5 (quoting *Starke*, 913 F.3d at 296). Courts consider multiple factors, mainly whether the screen is cluttered; the text and hyperlinks to the TOU are positioned directly below the relevant assent button; and the hyperlinks are contrasted with the background. *Id.* at *4-*5 (citing *Meyer*, 868 F.3d at 78-79 and *Nicosia*, 834 F.3d at 235-37). However, no factor is dispositive, and the Circuit has refused to "impose" a rigid list of "particular features that must be present to satisfy the reasonably conspicuous standard." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 842 (2d Cir. 2021).

Courts have made it clear that "an electronic click can suffice to signify the acceptance of a contract ... as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Meyer*, 868 F.3d at 75 (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016)). Courts have found a contract where a plaintiff assents to a website's TOU when completing a purchase or registering an account, similar to the processes that each Plaintiff in this case completed. *Meyer*, 868 F.3d at 80 (vacating denial of motion to compel arbitration where "[t]he registration process allowed Meyer to review the Terms of Service prior to registration [and] the text on the Payment Screen not only included a hyperlink to the Terms of Service, but expressly warned the user that by creating an

Uber account, the user was agreeing to be bound by the linked terms"); *Camilo*, 384 F. Supp. 3d at 437-40 (granting motion to compel arbitration where user had "an opportunity to scroll through the . . . Terms of Service before accepting the terms"). In *Meyer* and *Camilo*, courts have compelled arbitration when a TOU containing an arbitration provision appeared directly below a button to complete a purchase or register an account. *Meyer*, 868 F.3d at 78; see also *Camilo*, 384 F. Supp. 3d at 437-40 (same).

      Defendants contend Plaintiffs received inquiry notice while making purchases or registering accounts on Defendants' Websites via desktop computer or mobile device. Defendants allege that by assenting to the Websites' TOU, Plaintiffs agreed that "any and all disputes, claims and causes of action" against Fanatics, NFLP, or any of their respective subsidiaries or affiliates that in any way "aris[e] out of or [are] connected with" the Fanatics or NFLShop websites must be brought exclusively in arbitration. ECF No. 42 at 12-13. Plaintiffs allege they are not bound to the NFLShop or Fanatics TOU because they were not effectively on notice of them. Plaintiffs raise issues regarding the appearance and placement of the TOU. As displayed on desktop computers, Plaintiffs argue the hyperlinks to the TOU are not presented in a "clear and conspicuous manner" because the hyperlinks are smaller and of lower contrast to the shipping and payment fields, the "Place Order" button, and logos. ECF No. 70 at 16-17. Plaintiffs cite to *Nicosia* for the proposition that plaintiffs are not on notice when a hyperlink to a website's terms and conditions is not "bold, capitalized, or conspicuous in light of the whole webpage," and contains "text . . . in at least four font sizes and six colors." 834 F.3d at 237. But no factor in this analysis is determinative.

      Here, Defendants' TOU comply with multiple factors to satisfy the "reasonably conspicuous" standard, and as such, Plaintiffs had reasonable notice of Defendants' Websites

7

TOU. Not only is Defendants' TOU disclaimer presented on an uncluttered screen, but also the hyperlink to the TOU is underlined and in contrast with the white background. Further, the hyperlink appears directly below the "Create An Account" and "Complete Order" assent buttons, and Plaintiffs were informed that "[b]y placing an order" or "[b]y signing up," "you agree to our Terms of Use . . ." Flinchbaugh Decl. ¶¶ 22, 26, ECF No. 42, Ex. A. See *Peiran*, 2021 WL 2043562, at *5 (granting motion to compel arbitration when "the plaintiff could not place accepted bids until clicking 'AGREE,' making clear that the plaintiff's acceptance of the terms was a condition precedent to continued use of the website."). Plaintiffs could not complete a purchase or create a Fanatics or NFLShop account without first agreeing to the TOU. Plaintiffs had the opportunity to read the entire Terms of Service by clicking on the corresponding link. Thus, by clicking the "Complete Order" or "Create An Account" buttons, each Plaintiff accepted the contract terms and entered into an agreement with Defendants. See *Meyer*, 868 F.3d at 75.

Plaintiffs next claim that on a mobile device, the hyperlinks to the TOU when creating an account or completing a transaction are obscured by the popup virtual keyboard. ECF No. 70 at 18-19, 21-22. On mobile, the TOU is underlined, hyperlinked, and against a white background. Plaintiffs similarly argue that the smaller size and lower contrast of the TOU hyperlink is insufficient to put Plaintiffs on notice. *Id.* However, courts have rejected the argument that the popup virtual keyboard obscures the TOU. *Meyer v. Kalanick*, 291 F. Supp. 3d 526, 534 (S.D.N.Y. 2018). On a mobile device, the Fanatics and NFLShop TOU hyperlinks still appear directly under the "Create An Account" or "Complete Order" buttons, and as such, Plaintiffs entered into an agreement with Defendants by clicking the assent buttons.

II. **The Defendants Who are Not Specifically Named in the Agreement Are Covered by It and May Enforce It.**

Having found that Plaintiffs entered into arbitration agreements with Defendants, the Court considers whether each Defendant is covered by the arbitration agreement.

The NFLShop and Fanatics arbitration agreements state that "you and we agree that any and all disputes" shall be subject to arbitration. Flinchbaugh Decl. ¶¶ 29, 34. The NFLShop TOU defines the term "we" to include the "Fanatics Entities and the Partner Entities," and the term "Partner Entities" includes "NFL Properties LLC and/or its affiliated entities." *Id.* ¶ 35. Plaintiffs cite to Section 203(c)(1) of the Delaware Corporate Code to argue that the 32 NFL teams are not "affiliates" of the NFLP because the teams do not exert control over the NFLP. But courts construing the term "affiliate" in a contract must use the term's "plain meaning." *Meltzer, Lippe, Goldstein & Breitstone, LLP v. Malfetti*, 2018 WL 4627667, at *11 (E.D.N.Y. Sept. 27, 2018), *aff'd*, 777 F. App'x 571 (2d Cir. 2019) (citing dictionary definitions to determine that the plain meaning of "affiliate" is to be "associate[d]" and "united in action or interest."). Black's Law Dictionary defines "affiliate" as "a corporation that is related to another corporation by shareholdings or other means of control." Black's Law Dictionary (11th ed. 2019).  Here, the 32 NFL teams are associated with NFLP and are thus "affiliates" covered by the NFLShop TOU. The Court finds Fanatics and the NFL Defendants are parties to the NFLShop arbitration agreement.

Similarly, the Fanatics arbitration agreement defines the term "we" to include "Fanatics, Inc. [predecessor to Defendant Fanatics, LLC] and/or its affiliates." Flinchbaugh Decl. ¶ 30. The Court too must look to the plain meaning of "affiliate" in this context. Dictionary.com defines the term affiliate as "a business concern in which a larger concern owns a minority stake" or "(especially in online retail) a company that retails goods on behalf of one or more other

9

companies, paying them a commission."[1] In this case, Defendants agree the NFL and Fanatics have an affiliate relationship because the NFL partially owns Fanatics. Compl. ¶ 5. Plaintiffs also allege a partnership between Fanatics and NFLP in which Fanatics licenses the NFL teams' intellectual property from NFLP and pays commissions to NFLP for NFL sales on Fanatics.com. *Id*. ¶ 173. The Court finds Fanatics and each of the NFL Defendants are covered by the Fanatics arbitration agreement.

In the alternative, if the Court were to find the Defendants affiliated with the NFL and Fanatics were not covered by the agreement, the affiliated Defendants could still compel arbitration under a theory of equitable estoppel.[2] "Generally, in the arbitration context, 'equitable estoppel allows a nonsignatory to a written agreement containing an arbitration clause to compel arbitration where a signatory to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory.'" *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020). In this case, Delaware law expressly governs the arbitration provisions, and allegations of "coordinated behavior between signatories and nonsignatories … based on the same facts, are inherently inseparable, [and] fall within the scope of the arbitration clauses at issue." *In re Titanium Dioxide Antitrust Litig*., 962 F. Supp. 2d 840, 851 (D. Md. 2013). See also *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, No. Civ. A. 2037-N, 2006 WL 2473665, at *4 (Del. Ch. 2016) (same). The Court has found that Plaintiffs assented to the TOUs, and Plaintiffs brought identical antitrust claims against affiliated Defendants. Affiliated Defendants may therefore compel arbitration against Plaintiffs.

---

[1] *Affiliate*, DICTIONARY.COM, https://www.dictionary.com/browse/affiliate (last visited May 7, 2023).
[2] Neither party takes the position that the issue of who can enforce the agreement should be decided by the arbitrator.

### III. The Parties Delegated to the Arbitrator the Issue of Whether Particular Disputes Are Covered by the Agreement.

In this case, the parties' arbitration agreements reflect an intention to have the arbitrator decide whether any disputes are covered by the agreement arbitrability for two primary reasons. First, the language of the arbitration agreements is very broad. Of relevance, the arbitration agreements provide "any and all disputes, claims and causes of action (collectively, 'Claims') arising out of or connected with the Website" in the case of Fanatics or "Properties" in the case of NFLShop "shall be resolved exclusively by binding arbitration under the rules of the American Arbitration Association ('AAA'))."). Flinchbaugh Decl. ¶¶ 29, 34. Plaintiffs argue that because the terms "Properties" and "Web Site" are defined as the web, mobile, and app versions of the respective website on which the TOU are found, the agreement calls for the arbitration of disputes arising out of the websites, and do not cover the agreements themselves. ECF No. 70 at 26. But this argument is unavailing. Here, both TOU are a part of Defendants' Websites and Properties, and thus disputes about the TOU are subject to arbitration. *Blash v. BCS Placements, LLC,* 2020 WL 2832777, at *4 (S.D.N.Y. May 31, 2020) (similarly finding agreement covering "all claims, disputes and other matters in question arising out of, or relating to, this letter agreement" reflected the "parties' clear intent to arbitrate issues of arbitrability"). Because these arbitration agreements seek to encompass "any and all disputes" related to the Agreements, they are sufficiently broad. Second, the arbitration agreements specifically incorporate the procedures of the AAA. "The rules of the [AAA] provide that arbitrators have the power to resolve arbitrability questions." *Schein,* 139 S. Ct. at 528. As a result, the incorporation of the AAA rules necessitates that an arbitrator, as opposed to this Court, decide arbitrability.

## CONCLUSION

For the reasons set forth by the Court, Defendants' Motion to Compel Arbitration is hereby **GRANTED.** This case is stayed pending resolution of the arbitration. The parties shall provide a status report within 30 days of the completion of the arbitration or within six months of the date of this order, whichever is sooner.

**SO ORDERED.**

**Dated:** **July 18, 2023**
   **New York, New York**

ANDREW L. CARTER, JR.
United States District Judge